[PUBLISH]

# In the
# United States Court of Appeals
# For the Eleventh Circuit

_____

No. 22-11626

_____

CHEWY, INC.,

                                                                          Petitioner,

*versus*

U.S. DEPARTMENT OF LABOR,

                                                                          Respondent.

_____

Petition for Review of a Decision of the
Occupational Safety and Health Review Commission
Agency No. 19-0868

_____

Before WILLIAM PRYOR, Chief Judge, and LUCK and HULL, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal concerns the Secretary of Labor's authority to fine an employer for failing to prevent an occupational hazard when the employer has complied with the Secretary's specific safety standard for that hazard. The Secretary of Labor cited and fined Chewy, Inc., for inadequately protecting its warehouse employees from "under-rides," a kind of forklift accident. The Secretary found that no specific standard covered the under-ride hazard and that Chewy had a general duty to protect its workers from that hazard. An administrative law judge upheld the citation and ruled that the standard Chewy cited, 29 C.F.R. § 1910.178, did not cover the under-ride hazard. We disagree. Because Chewy complied with the safety standard that specifically addresses under-rides, the Secretary cannot cite Chewy for failing to protect its workers from that hazard. We grant Chewy's petition for review, set aside the Commission's order, and vacate the citation.

## I. BACKGROUND

The Secretary cited Chewy after two of its warehouse workers had under-ride accidents within a six-month period, one in July 2018 and one in December 2018. The employee in the first incident was injured, and the employee in the second incident was killed. An under-ride occurs when the rear part of a forklift is short enough that it can pass under warehouse shelves without colliding with them. If the forklift can pass under the shelving, the operator

can hit or be crushed by the shelving, as happened to Chewy's workers.

Before the 2018 accidents, Chewy had two measures in place to prevent under-rides. First, according to a Chewy safety officer, the company trained its forklift operators to "look[] in the direction of travel, maintain[] full control of the fork[lift], [and] operat[e] at safe speeds." Second, Chewy maintained warehouse aisles significantly wider than the minimum safe width for its forklifts. But Chewy did not implement a third strategy, modifying the shelving or forklift to ensure that the forklift hits a shelf before it can pass under that shelf, until after the fatal accident in December 2018.

The Secretary delivered a "Citation and Notification of Penalty" to Chewy in May 2019 after the Department of Labor's investigation of the 2018 accidents. The Secretary found that Chewy violated its statutory general duty to provide a safe workplace, 29 U.S.C. § 654(a)(1), because Chewy had not adopted the third strategy, which the Secretary found feasible and helpful, before the accidents. *Cf. Ga. Elec. Co. v. Marshall*, 595 F.2d 309, 320–21 (5th Cir. 1979) (explaining the elements of a general-duty-clause violation). Chewy contested the citation before an administrative law judge on the ground that an existing Department of Labor safety standard for forklift operation addressed under-rides and preempted any statutory general duty regarding under-rides.

The administrative law judge upheld the citation. *Chewy, Inc.*, No. 19-0868 (OSHRC Feb. 22, 2022) (ALJ), 2022 WL 1009607. She concluded that because the promulgated forklift operation

standard, 29 C.F.R. § 1910.178, did not prevent all under-rides, Chewy was not excused from its general duty to protect workers from them. *Chewy*, 2022 WL 1009607, at *19–22. And the administrative law judge ruled that Chewy failed to fulfill its general duty because under-rides are a known hazard in the industry and Chewy declined to adopt the feasible preventative measures of modifying either its forklifts or its shelving. *Id.* at *36, *38. The Occupational Safety and Health Review Commission denied discretionary review, so the administrative law judge's decision became a final order of the Commission. *See* 29 U.S.C. § 661(j).

## II. STANDARD OF REVIEW

This Court "will set aside an order of the Commission only if it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." *C&W Facility Servs., Inc. v. Sec'y of Lab.*, 22 F.4th 1284, 1287 (11th Cir. 2022) (citing 5 U.S.C. § 706(2)(A)). Federal courts have historically deferred to the Secretary's interpretation of her own regulations before the Commission, *see Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 157–58 (1991), but we defer only if that interpretation is "reasonable," *U.S. Dep't of Lab. v. Tampa Elec. Co.*, 38 F.4th 99, 101 n.2 (11th Cir. 2022) (citation omitted).

## III. DISCUSSION

Chewy challenges the Commission's order on several grounds, but we address only one because it is dispositive. Chewy argues that it cannot be held liable under the general-duty clause because it complied with a specific standard, *see* 29 C.F.R.

§ 1910.178, that already addresses the under-ride hazard. *See id.* § 1910.5(f). We agree.

The Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.*, "impose[s] dual obligations on employers." *ComTran Grp., Inc. v. U.S. Dep't of Lab.*, 722 F.3d 1304, 1307 (11th Cir. 2013). Employers have a "general duty," *id.*, to provide their employees "employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm," 29 U.S.C. § 654(a)(1). An employer fails to comply with this requirement if he has "failed to render [the] work place free of a hazard; . . . the hazard was recognized; . . . the hazard caused or was likely to cause death or serious physical harm"; and "the hazard [was] preventable." *Ga. Elec. Co.*, 595 F.2d at 320–21 (internal quotation marks and citation omitted). Employers "also have a 'special duty' to comply with all mandatory health and safety standards." *ComTran Grp.*, 722 F.3d at 1307; *see* 29 U.S.C. § 654(a)(2). The Secretary of Labor promulgates those standards through a notice-and-comment process, *see* 29 U.S.C. § 655(b), and has the authority to investigate employers for violations of their duties under the Act, issue citations, and assess monetary penalties. *ComTran Grp.*, 722 F.3d at 1307.

Under Department of Labor regulations, "[a]n employer who is in compliance with any" specific safety standard "shall be deemed to be in compliance with" the general-duty clause, "but only to the extent of the condition, practice, means, method, operation, or process covered by the standard." 29 C.F.R. § 1910.5(f).

The Commission was obliged to abide by this preemption regulation in its decision. *See Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986) ("The failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct."). The principle that compliance with an applicable safety standard bars general-duty liability is also reflected in Commission precedent that states that the general-duty clause is inapplicable for a failure to prevent a hazard "if a standard specifically addresses the hazard cited." *Active Oil Serv., Inc.*, 21 O.S.H. Cas. (BNA) 1184 (No. 00-0553, 2005), 2005 WL 3934873, at *2. And we have already equated the phrase "condition, practice, means, method, operation or process" with "hazard" in the context of an adjacent Department of Labor preemption regulation that establishes the relationship between general and specific safety standards. *See Brock v. Williams Enters. of Ga., Inc.*, 832 F.2d 567, 570 (11th Cir. 1987) (citing 29 C.F.R. § 1910.5(c)).

The Secretary has promulgated a safety standard that addresses safe forklift operation. Section 1910.178 governs "[p]owered industrial trucks," including forklifts. 29 C.F.R. § 1910.178(a)(1). This standard addresses the Secretary's concerns about the risk that a forklift could "run into a column or other part of the building." Powered Industrial Truck Operator Training, 63 Fed. Reg. 66,238, 66,242 (Dec. 1, 1998). The standard requires that forklift operators receive safety training. 29 C.F.R. § 1910.178(*l*). Specifically, operators must be trained to "look in the direction of, and keep a clear view of the path of[,] travel" and maintain the vehicle at a safe

speed. *Id.* § 1910.178(n)(6), (8). All agree that the Secretary did not find that Chewy violated this standard.

Compliance with this specific standard addresses the under-ride hazard, so the Commission erred in upholding the Secretary's citation under the general-duty clause. The Secretary concedes and has long maintained that section 1910.178 requires employers to address the under-ride hazard. In a 2009 bulletin, for example, the Occupational Safety and Health Administration recommended that employers "[t]rain employees to operate forklifts safely as required by paragraph (l) of 29 C.F.R. 1910.178" because that training "will reduce the risk of under-ride hazards." In 2018, the Secretary argued before the Commission that an employer violated section 1910.178(*l*) because it "failed to inform employees about 'crushed by' or 'underride hazards' they faced while operating [forklifts.]" *Pharmasol Corp.*, 2018 O.S.H.D. (CCH) ¶ 33,692 (No. 16-1172, 2018) (ALJ), 2018 WL 5013447, at *25. And at Chewy's hearing, the Secretary's expert witness testified that "proper" training under the standard would address the under-ride hazard, which would be at the "top of the list" of forklift operation hazards. *See* 29 C.F.R. § 1910.178(*l*) (requiring operator training). Another of the Secretary's witnesses testified that the standard "specifically addresses the hazard of [forklift] operators striking structures in a warehouse," including "the hazard of a [forklift] operator striking a storage rack," which is precisely what is dangerous about an under-ride event.

The Secretary argues that the general-duty clause is not preempted because training cannot completely eliminate the under-ride hazard, so "no specific standard . . . *entirely* covers the hazard alleged." (emphasis added.) The administrative law judge agreed and explained that "even adhering to section 1910.178, the under-ride hazard would still exist in the workplace due to inattention and inadvertence." *Chewy*, 2022 WL 1009607, at *22. Under this logic, section 1910.178 may "cover" forklift collisions in general, but it does not cover the hazards that occur when forklifts have already passed under shelving. So the general-duty clause, the administrative law judge reasoned, still required Chewy to address "what happens in the event of an under-ride." *Id.* at *20. But this interpretation of the preemption regulation is unreasonable, and, even if it were correct, it was unreasonably applied to Chewy.

The Secretary's distinction between a standard that prevents the under-ride hazard and a standard that addresses the hazards that arise in the event of an under-ride, if accepted and extended to other cases, would upend the regulatory scheme. The Secretary could avoid preemption of any standard by distinguishing between the hazards the standard addresses and the hazards that occur when the standard fails. Instead, as *amicus curiae* the Retail Litigation Center, Inc., explains, if the Secretary determines that current standards "are inadequate to address the under-ride hazard, the [Occupational Safety and Health] Act provides the agency with legal authority to impose new requirements on the industry." The Secretary can modify the safety standards through public notice and comment. *See* 29 U.S.C. § 655(b). That process, as the Retail

22-11626               Opinion of the Court                        9

Litigation Center explains, provides the Secretary with critical input from interested parties about the "feasibility, potential risk reduction, and/or unintended impacts" of proposed standard revisions. But if the inadequacy of the existing standards precludes preemption, the Secretary can use the general-duty clause to update specific safety standards without the required procedural safeguards.

The administrative law judge's interpretation of section 1910.5(f) is also unreasonable because it requires that compliance with the specific standard eliminate the hazard for preemption to occur. Section 1910.5(f) nowhere requires that compliance with the standard "eliminate" a hazardous condition. Nor does Commission precedent require that the standard eliminate the hazard. *See Active Oil*, 2005 WL 3934873, at *2; *see also, e.g.*, *Armstrong Cork Co.*, 8 O.S.H. Cas. (BNA) 1070 (No. 76-2777, 1980), 1980 WL 10754, at *4 ("[T]he standard must be addressed to the particular hazard for which the employer has been cited under the general duty clause."). Neither the Secretary nor the administrative law judge has explained why we should insert that requirement into the test for preemption, beyond a stray statement from a non-binding 1981 Commission decision that the hazard must be "entirely" covered. *See Ted Wilkerson, Inc.*, 9 O.S.H. Cas. (BNA) 2012 (No. 13390, 1981), 1981 WL 18797, at *3; *see also Sec'y, U.S. Dep't of Lab. v. Action Elec. Co.*, 868 F.3d 1324, 1331 & n.2 (11th Cir. 2017) ("[Commission precedent] is in no way binding on this Court's decision . . . .").

Even if the line between preventing under-rides and addressing the hazards that under-rides cause were tenable, the administrative law judge did not reasonably apply the distinction. *See Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) (explaining that the "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained"). The administrative law judge rejected Chewy's "attempts to reframe the issue in terms of preventing an under-ride." *Chewy*, 2022 WL 1009607, at *21. But the administrative law judge acknowledged that the Secretary's proposed abatement measures—the measures she determined were required by the general-duty clause—addressed the under-ride hazard by "preventing an under-ride from occurring." *Id.* at *29–30. The Secretary contended that Chewy was required to install a metal structure behind a driver that would *block* an under-ride or to modify shelves so that forklifts would crash into shelving *before* they could pass under them. *Id.* These measures, like the operator training section 1910.178(*l*) requires, do not protect a worker *in the event* of an under-ride. They instead prevent under-rides. So the administrative law judge acted arbitrarily and capriciously by failing to abide by the principle on which she purported to rest her decision. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency . . . offered an explanation for its decision that runs counter to the evidence before the agency . . . .").

## IV. CONCLUSION

We **GRANT** the petition for review, **SET ASIDE** the order of the Commission, and **VACATE** the citation.

22-11626               H<span/>ULL, J., concurring                1

H<span/>ULL, Circuit Judge, concurring:

I concur in the result of the majority opinion because (1) the Secretary's specific safety standard in 29 C.F.R. § 1910.178 covers and applies to the under-ride hazard in this case, (2) the Secretary did not charge, much less find, that Chewy violated this § 1910.178 standard, and (3) the general duty clause is inapplicable here because that specific safety standard covers and applies to the under-ride hazard in this case.

An under-ride hazard and injury can occur (1) when a forklift operator is backing up and the backing up continues while the rear of the forklift passes underneath a horizontal crossbar or shelving rack, (2) the crossbar or shelving rack thus enters the area where the forklift operator is standing with his back to the crossbar or shelving rack, and (3) the crossbar or shelving rack crushes the operator as he continues to back up. The warehouse aisles here are wide enough to allow a forklift driver to turn, back up, and maneuver without going under the shelving rack.[1]

Section 1910.178 contains safety requirements relating to the use of "[p]owered industrial trucks," which include forklifts. 29 C.F.R. § 1910.178(a)(1). Section 1910.178(*l*) requires employers to "ensure that each [forklift] operator is competent to operate a powered industrial truck safely, as demonstrated by the successful completion of the training and evaluation specified in this

---

[1] The aisles in Chewy's warehouse were 127 inches wide—12 inches wider than the 115-inch aisle width required by the forklift manufacturer.

| 2 | HULL, J., concurring | 22-11626 |

paragraph (*l*)." 29 C.F.R. § 1910.178(*l*)(1).  The regulation specifies that forklift operators "shall receive initial training in the following topics," which include "[s]urface conditions where the vehicle will be operated," *id.* § 1910.178(*l*)(3)(ii)(A), and "[o]ther unique or potentially hazardous environmental conditions in the workplace that could affect safe operation," *id.* § 1910.178(*l*)(3)(ii)(I).  Operators also must be trained to "look in the direction of, and keep a clear view of the path of[,] travel" and maintain the vehicle at a safe speed.  *Id.* § 1910.178(*l*)(3)(iii), (n)(6), (n)(8).  The preamble to § 1910.178 reads:

> A vehicle that is out of control or being operated by a driver whose view in the direction of travel is restricted can strike an employee, run into a column or other part of the building, or strike stored material, causing the material to topple and injure employees in the area. *Effective driver training teaches operators to act properly to minimize these hazards* to themselves and other employees.

*Powered Indus. Truck Operator Training*, 63 Fed. Reg. 66,238, 66,242 (Dec. 1, 1998) (emphasis added).

The Secretary's main argument as to preemption is that the cited hazard in this case—the under-ride hazard—is not covered by § 1910.178(*l*) and is materially different from the hazard of running into or striking a storage rack that is referenced in the preamble to § 1910.178.  But the evidence indicates the Secretary understood the under-ride hazard was also covered by the requirements in § 1910.178.

22-11626          HULL, J., concurring          3

For starters, the Secretary has published guidance advising employers that training on under-ride hazards should be included in the training program required by § 1910.178. This guidance is a Safety Health Information Bulletin entitled "Standup Forklift Under-ride Hazards." The Bulletin describes and addresses the cited hazard in this case—namely, the under-ride hazard that occurs when a forklift passes beneath a horizontal crossbar, such that "the crossbar can enter the operator's compartment and crush the operator inside the compartment." Further, the stated purposes of this Bulletin are to: (1) "[a]lert standup forklift operators and employers to the crushing hazard to the operator associated with under-ride," (2) "[r]ecommend work practices that can be implemented by the employer to eliminate the under-ride hazard," and (3) "[s]tress the importance of training employees on the safe operation of standup forklifts."

The Bulletin also observes that proper operator training is "essential" to the safe operation of forklifts. It also states that: (1) § 1910.178(*l*) "contains training and certification requirements for the use of forklifts that are specific to the workplace," and (2) § 1910.178(n)(1) and (n)(6) "require operators to keep the forklift under control at all times and to look in the direction of travel."

The Bulletin also offers various recommendations to employers to address the under-ride hazards associated with operating standup forklifts. One of these recommendations is to "[t]rain employees to operate forklifts safely as required by [29

4                    HULL, J., concurring                    22-11626

C.F.R. § 1910.178(*l*)], including recognizing the hazards of the workplace created by the use of the vehicles."

Second, the Secretary previously has taken the litigation position that a failure to inform employees about the under-ride hazard violated § 1910.178(*l*). Specifically, in *Pharmasol Corp.*, the Secretary argued that an employer violated § 1910.178(*l*) because it "failed to inform employees about 'crushed by' or 'underride hazards' they faced while operating stand-up reach trucks." OSHRC Doc. No. 16-1172, 2018 WL 5013447, at *25 (OSHRC Sept. 4, 2018). This litigation position is inconsistent with the Secretary's position in this case that § 1910.178(*l*) does not address the under-ride hazard.

Third, the Secretary conceded in its initial brief that training on the under-ride hazard *should be included in the comprehensive training program required by § 1910.178(l)*.

Fourth, the Secretary is primarily left to argue that the employer is required to prevent and wholly eliminate all under-ride hazards (1) by altering the manufactured forklift vehicle itself by adding bars in the back to prevent a highly trained operator from ever, no matter what, going under a horizontal shelving rack, or (2) by lowering the bottom shelves in warehouses, although striking those shelves (as opposed to passing a little under) might cause merchandise to topple over on the operator. There may well be additional work safety regulations worth adopting, requiring, and then enforcing against employers, but the Secretary has not done so to date.

22-11626　　　　　　Hull, J., concurring　　　　　　5

Given the Secretary's regulatory text, the record evidence which includes the Secretary's guidance, and certain relevant law discussed in the majority opinion, it was unreasonable for the ALJ to hold that § 1910.178 does not cover the under-ride hazard here and that instead the general duty clause applies to the cited under-ride hazard in this particular case.